IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JESS L. RAUCH,                                    :
                                                  :
          Plaintiff,                              :
                                                  :          CIVIL NO. 3:CV-04-2216
     vs.                                          :
                                                  :          (JUDGE CAPUTO)
DEPARTMENT OF CORRECTIONS                          :
OF THE COMMONWEALTH OF                             :
PENNSYLVANIA, ET AL.,                              :
                                                  :
          Defendants.                             :

M E M O R A N D U M

I.     Introduction

          At all times relevant to this lawsuit, Plaintiff, Jess L. Rauch, a former inmate, was

housed at the Camp Hill State Correctional Institution ("SCI-Camp Hill"), Camp Hill,

Pennsylvania.[1]  Plaintiff, with the assistance of counsel, initiated this action pursuant to 42

U.S.C. § 1983 on October 7, 2004, against the Pennsylvania Board of Probation and Parole

---

[1]  Although Rauch was transferred to other facilities prior to his February 26, 2006,
release from the Pennsylvania Department of Corrections ("DOC"), all claims lodged against the
named Defendants occurred while Rauch was housed at SCI-Camp Hill.  We also note that
Rauch is not currently incarcerated.  As such, any claims for injunctive relief are moot.  See
Abdul-Akbar v. Watson, 4 F.3d 195, 206-207 (3d Cir. 1993).

("PBPP"), the Department of Corrections, Janna Hammit, Valotti Prather and Robin Rommel. On October 13, 2004, Plaintiff filed an Amended Complaint.  On December 28, 2004, Rauch filed a second Amended Complaint (Doc. 6), naming the following as Defendants: Gateway Rehabilitation Center ("Gateway") a private contractor who administered a drug and alcohol therapeutic community at SCI-Camp Hill, and two its employees, Janna Hammit and Carol Martin.[2]  Rauch's allegations can be summarized as follows:  On September 4, 1998, Rauch commenced serving a three to eight year state sentence.   The PBPP paroled Rauch on April 9, 2001.  On June 8, 2002, Rauch was recommitted as a technical parole violator after frequenting a bar and imbibing alcohol.  The PBPP required Rauch to participate in and complete a Residential Substance Abuse Treatment ("RSAT") program.  Rauch claims he was promised by an unknown PBPP representative that upon his completion of the first phase of the RSAT program, a six months therapeutic community based substance abuse program offered within confines of the prison, he would immediately be transferred to the second phase, a half way house, and then reparole. (Id.)

Rauch enrolled in an RSAT program at SCI-Camp Hill that was operated by Gateway.  Rauch claims Ms. Hammit, the RSAT program director, terminated him from the program in retaliation for personal comments he wrote about her and other staff members in

---

[2]  All other originally named Defendants were voluntarily dismissed by Plaintiff on December 10, 2004.  (See Doc 5.)

his therapeutic journal, and because Rauch's mother repeatedly contacted Ms. Hammit "to discuss [Ms. Hammit's] animosity towards" her son.  (Id.)  Further, Rauch claims Defendants threatened him with false misconducts and were verbally abusive to him.  Rauch contends that he was denied parole as a direct result of Defendants' retaliatory act of discharging him from the RSAT program.  Rauch was released from DOC on February 26, 2006, at the expiration of his sentence.  (Id.)

Presently before the Court is Defendants' Motion for Summary Judgment asserting, in part,  that they are not state actors for the purpose of § 1983.  Alternatively, they argue that their actions did not violate Rauch's constitutional rights, and that they did not possess the ability or means to grant or deny Rauch parole regardless of his completion of the therapeutic program.  For the reasons that follow, the Defendants' motion for summary judgment will be granted.[3]

---

[3] Although it appears from the record that Rauch failed to exhaust his administrative remedies with respect to the claims raised in the complaint, Defendants did not raise this affirmative defense in their summary judgment motion.  Therefore, summary judgment will not be granted on this basis.  Jones v. Bock, ___ U.S. ___, ___, 127 S. Ct. 910, 921, 166 L.Ed.2d 798 (2007).

II.    **Undisputed Facts as Established by the Record.**[4]

Public records show that Jess Lee Rauch, is a white male born on June 17, 1976.  On August 20, 1998, Rauch was convicted of involuntary manslaughter, driving under the influence of alcohol, and reckless endangerment as a result of a motor vehicle accident. (Doc 32, Defendants' Statement of Material Facts ("SMF") at ¶ 1.)  Rauch was sentenced to three to eight years imprisonment.  (Id.)  On September 4, 1998, Rauch commenced serving his sentence at the Frackville State Correctional Institution ("SCI-Frackville").  (Doc. 6, Amended Complaint at ¶ 9.)  In April 2001, after spending a little over two years and seven months in state custody, Rauch was paroled.

On June 8, 2002, Rauch violated the terms of his parole by patronizing a bar and imbibing alcoholic beverages.  (Doc. 33-14, Exh. M, Rauch Deposition Transcript ("Rauch Depo."), RR. 10 - 11.)[5]  On June 29, 2002, the PBPP recommitted Rauch to the DOC as a technical parole violator.  He received a ten month sentence for his consumption of alcohol and a concurrent nine month sentence for failing to comply with all laws.  (Doc. 6 at ¶ 13; SMF at ¶

---

[4]  All material facts set forth in the Defendants' statement of undisputed facts are deemed admitted as Rauch failed to file a counter statement as required by M.D. Local Rule 56.1.  Nonetheless, where Rauch offers evidence in his opposition materials that presents a relevant genuine dispute of fact, the Court will consider it when resolving the present motion. However, the Court may not consider evidence on a motion for summary judgment that would not be admissible at trial.  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n. 13 (3d Cir. 1999).

[5]  "R." or "RR." references are to the CM/ECF pagination of the document cited.

4.)  The PBPP also ordered Rauch to participate in, and complete, a Residential Substance Abuse Treatment Program ("RSAT").  (SMF at ¶ 4.)

The RSAT program is a federally funded program.  The Commonwealth of Pennsylvania contracted with Gateway from 1999 until October 2003 to provide a RSAT program at SCI-Camp Hill.  (Doc. 24, Joint Case Management Plan; Doc. 33-16, Service Purchase Contract, RR. 1 - 13.)  Gateway's contract with the Commonwealth of Pennsylvania specifically defines Gateway "as an independent contractor and not as an employee or agent of the Commonwealth."  (Id. at R. 3.)  At all times relevant to this action, Janna Hammit, was Gateway's Director of the SCI-Camp Hill RSAT program, while Carol Martin was a counselor. (Doc. 18, Answer.)

Plaintiff voluntarily entered Gateway's RSAT program at SCI-Camp Hill on August 15, 2002.  (SMF at ¶ 7; Doc. 24, Joint Case Management Plan.)  While a member of the RSAT therapeutic communiry, Rauch was required to participate in group therapy.  Rauch admits that he "didn't really talk to a lot of people" while in the RSAT program.  (Rauch Depo. at R. 30.)  After Rauch was not promoted from level two to level three within the program, Rauch told others in the program that "I don't care what level, that makes no difference to me because six months I'm getting out of here".  (Id. at RR. 29 - 30.)  Rauch claims that the PBPP

representative[6] at his parole revocation hearing guaranteed him immediate placement in a halfway house upon his completion of the six month in prison RSAT program.  (Id. at R. 12; SMF at ¶ 9.)  RSAT participants were also expected to self-police each other and issue one another demerits for rule violations.   (Rauch Depo. at R. 17.)  The RSAT staff kept track of program participant's demerits.  (Id.)  Rauch refused to "write [other inmates] up or play cop or whatever [the RSAT staff]  want[ed] me to do."  (Id. at RR. 17 - 18.)  While in the program, Rauch admits he received "a couple" of demerits.  (Id. at R. 17.)

As part of the RSAT program, Rauch was required to keep a written daily journal.  (Doc. 33-15, Journal Writing at R. 1.)  Gateway's policy stated that the journal was a tool "to help you remember, sort things, out and see yourself more clearly, while your brain is healing."  (Id.)  RSAT participants were encouraged to take time "when relevant or helpful ... to jot down ... any feeling you are having ... positive and negative."  (Id.)  Gateway's journal guidelines state, inter alia,  that "[n]o one besides you and your counselor will read it."  (Id.)  Carol Martin was Rauch's assigned counselor.  (Doc 33-14, Rauch Depo at R. 15.)  According to Rauch, he was not aware that RSAT counselors would read his journal.  (Id. at R. 23.)  Rauch does not know whether the other counselors read the journals of other inmates.  (Id.)  Gateway's RSAT notice of "Patient Rights" states that "[e]very patient's confidentiality will be

---

[6]  The PBPP hearing examiner is unidentified and has no relationship with the Defendants in this action.  (SMF at ¶ 10.)

upheld within the limits of Federal and State regulations.  This means information about you will only be released with your written permission" except under limited circumstances.  (Doc. 33-15, Patient Rights at R. 2.)  Gateway's guidelines did not prohibit RSAT counselors or corrections staff from reading Plaintiff's journal.  (SMF at ¶ 15.)  There are no federal or state statute or regulations that prohibited Gateway's employees from obtaining Plaintiff's journal, reading it and sharing it within a therapeutic setting.  (SMF at ¶ 16.)

Ms. Hammit did not check Rauch's journal on a daily basis.  (Doc 33-14, Rauch Depo at R. 58.)  The first, and only, time Ms. Hammit reviewed Rauch's journal was after he approached her to discuss why his program release date had been extended.  (Id. at RR. 19, 26 - 27.)  Rauch objected to the extension and questioned Ms. Hammit as to "how are you going to play the parole board[?]" (Id. at R. 27.)  Rauch then gave Ms. Hammit permission to read his journal.  (Id. at R. 19 and R. 26.)  When Ms. Hammit asked if she could "hold on to [it] and read it," Rauch said "I don't care but you're not going to like everything you read in it." (Id. at R. 19.)

All of the RSAT counselors at SCI-Camp Hill were women.  (Id. at R. 14.)  In his journal, Rauch referred to the counselors as "dumb cunts" and "devils or stuff like that" and wrote that "a bunch of monkeys [could] run this program better than them." (Id. at R. 22 and R. 41.)  Rauch also wrote "a couple of negative feelings ... about the program or [Ms. Hammit] or the other people in the program or the inmates." (Id. at R. 21.)  Rauch was not immediately

removed from the RSAT program after Ms. Hammit read his journal.  (Id. at R. 20.)

Rauch did not successfully complete the RSAT program within six months.  (SMF at ¶ 12 and ¶ 17.)  Rauch does not know why his six month period was extended.  Rauch agreed to participate in the RSAT therapeutic community for six months, "not six months maybe more."  (Doc. 33-14, Rauch Depo. at R. 12 and R. 27. )  Defendants extended Plaintiff's participation in the program an additional three to four weeks to give Rauch time to satisfy the program's requirements in order for him to move on to the next level, a halfway house, if approved by the PBPP.  (SMF at ¶ 18; Doc. 33-3, March 6, 2003 Letter from Superintendent Kelchner; Doc. 33-14, Rauch Depo at RR. 26 - 27.)  Rauch was also given a new RSAT graduation date and enrolled in, and completed a two-week Community Orientation and Reintegration Program ("CORE"), a program necessary prior to participation in the second phase of the RSAT program.  (Doc.33-14, Rauch Depo. at R. 27; Doc. 36-2, at R. 29, Exh. D, Certificate of Completion dated February 14, 2003.)

During his RSAT stay, Rauch's mother telephoned Ms. Hammit two or three times regarding her son and questioned Ms. Hammit's capability to run the RSAT program. (Doc. 36-2, Select Portions of Mrs. Rauch's Depo. at R. 25.)  After one such call, Ms. Hammit commented "in front of everyone" that Rauch had his "mommy call here to talk to me."  (Doc, 33-14, Rauch Depo. at R. 20.)  Another call took place after Rauch's release date was extended. (Id.)  Rauch then "had [his] mom" call Ms. Hammit's supervisor, Ms. Prather, the

RSAT Supervisor and a non-defendant.[7]  (Id.)  The next day Rauch was discharged from the RSAT program.  (Id. at R. 21 and Portions of Mrs. Rauch's Depo. at R. 25.)  Rauch was discharged from the RSAT program on February 25, 2003, for non-compliance with the program's policies approximately two weeks after staff extended his stay.  (SMF at ¶ 19.)

Superintendent Kelchner, a non-defendant, in responding to Mrs. Rauch's letter of inquiry regarding her son, reported that:

> It is very evident that Mr. Rauch was outside [the RSAT program] guidelines with his remarks.  Several times he made very inappropriate remarks about staff.  Instead of focusing on his feelings and thinking, the remarks were often negative and inappropriate.  Ms. Hammett (sic) believes these remarks reflect his attitude toward RSAT.
>
> The RSAT staff asked for an extension of his time in the program so that he might improve his performance.  However, when Mr. Rauch failed to turn in two mandatory assignments it was the unanimous decision of staff that he be removed from the program.
>
> After reviewing all the documentation of his participation, Mr. Kressler, [the Unit Manager of the block where the RSAT program is located], conclude[d] Mr. Rauch was not open to the program.
>
> ...
>
> Because of his failure to meet program requirements, Mr. Rauch did not successfully complete Phase I.  He will not be transferred to Phase 2.  He will be returned to the institution that originally paroled him for further review by the PBPP.

---

[7]  The Record does not reveal for whom Ms. Prather worked, Gateway or the DOC.

(Doc. 33-3, Kelchner Letter dated March 6, 2003.)

Rauch believes he completed every assignment given to him.  (Doc. 33-14, Rauch Depo at R. 42.)  Rauch does not know what Mr. Kressler knew or his reasons for concluding that he was not open to the RSAT program.  (Id. at R. 43.)

Mr. Steve Hoke, is a Corrections Counselor at SCI-Camp Hill and non-defendant. (Id. at R. 62, R. 99.)   While housed at SCI-Camp Hill, Rauch was on Mr. Hoke's caseload for only one day, August 14, 2002.  Mr. Hoke, however, had contact with Rauch after his expulsion from the RSAT program and prior to his return to SCI-Frackville.  (Doc. 36-2, R. 30, March 8, 2004, Hoke letter.)  Mr. Hoke opines that Rauch was removed from the RSAT program because of a "personal agenda with the RSAT programing director, Ms. Hammitt."  (Id.)  He basis this opinion on the "verbal comments" made to him by Ms. Hammitt.  Ms. Hammitt "mentioned" to him that she had several arguments with Rauch's mother and was upset about her authority being questioned.  (Id.)  Mr. Hoke states that "[b]ecause [Rauch] was approximately ten days from completing the RSAT program when he was removed, [he] feels his positive work to that point outweigh[ed] the reasons for removal."  (Id.)  Rauch claims Mr. Hoke told him that Ms. Hammit showed him his RSAT journal.  (Doc. 33-14, Rauch Depo. at RR. 98 - 99.)  Mr. Hoke's March 8, 2004, letter, however, does not suggest that he was shown, or otherwise reviewed, Rauch's journal entries, any portion of his RSAT files, or counselor notes during his stay in the RSAT unit at any time. (See Doc. 36-2, March 8, 2004, Hoke letter.)  Rauch did not file a

grievance regarding his removal from SCI-Camp Hill's RSAT program, rather he tried resolving the matter through the unit manager.  (Doc. 33-14, Rauch Depo. at R. 33.)

Rauch states that Ms. Hammit and/or Ms. Martin also treated other inmates unfairly.  (Id. at R. 30.)  Rauch claims Ms. Hammit "had it out" for an inmate only identified as "Toby," and another named Brian Kenny.  (Id. at R. 31.)  Rauch does not know why Toby was kicked out of the program.  (Id.)  According to Rauch, Kenny was "written up" several times but after Kenny "went back and sort of, you know, kissed [Ms. Hammit's] ass," he was not removed from the program.  (Id.)  According to Rauch, he "wasn't [going to] kiss [Ms. Hammit's] ass."  (Id. at R. 28.)

In May 2003, Plaintiff received his first parole review since his removal from the RSAT program.[8]  He met and spoke with a hearing examiner who then made a recommendation to the PBPP.  (Id. at RR. 32 - 33.)  Eventually the PBPP issued Notice of Board Decision ("NOBD") denying Rauch reparole.  The reasons cited included:

---

[8]  In his Amended Complaint, Rauch stated that during this review the PBPP did not have a copy of Mr. Hoke's letter recommending him for parole and "would not give Mr. Rauch the chance to obtain this letter or consider Mr. Rauch's testimony regarding the contents of the letter."  (See Doc. 6, Amended Complaint at ¶ 31.)  However, this would seem impossible as Mr. Hoke's letter is dated March 8, 2004, some 280 days after Rauch's first reparole review took place.  Plaintiff's counsel offers no explanation for this apparent chronological discrepancy nor does he suggest the date affixed to Mr. Hoke's letter is inaccurate.  The record supports the finding the Mr. Hoke's letter was not written before March 8, 2004, thus, it was unavailable to PBPP in 2003.

THE RECOMMENDATION MADE BY THE DEPARTMENT OF
CORRECTIONS.

YOUR PRIOR HISTORY OF SUPERVISION FAILURE(S).

REPORTS, EVALUATIONS AND ASSESSMENTS CONCERNING
YOUR PHYSICAL, MENTAL AND BEHAVIOR CONDITION AND
HISTORY.

YOUR NEED TO PARTICIPATE IN AND COMPLETE
ADDITIONAL INSTITUTIONAL PROGRAMS.

YOUR INSTITUTIONAL BEHAVIOR, INCLUDING REPORTED
MISCONDUCTS OR CCC FAILURE.

YOUR INTERVIEW WITH THE HEARING EXAMINER AND/OR
BOARD MEMBER.

(Doc. 33-4, Exh. C, June 9, 2003, NOBD.)  The PBPP considered Rauch for reparole on three

more occasions.  (See Doc. 33-5, Exh. D, May 25, 2004, NOBD; Doc. 33-6, Exh. E, April 29,

2005, NOBD; and Doc. 33-7, Exh. F, October 28, 2005, NOBD.)  On each occasion, reparole

was denied based, in part, on Rauch's unacceptable compliance with prescribed institutional

programming.  (Id.)  Each denial advised Rauch that at the next review the PBPP would

consider his participation and successful completion in a substance abuse program.  (Id.)

Rauch was aware of the PBPP's desire to have him participate in another therapeutic

community program.  (Doc. 33-14, Rauch Depo. at R. 34.)  Every time Rauch went before the

PBPP he argued that he had already "did" a therapeutic community program but the PBPP

"didn't want to believe [him]."  (Id.)  Rauch's termination from the SCI-Camp Hill RSAT program

did not prevent him from getting into a substance abuse therapeutic community program offered at SCI-Frackville.  (<u>Id</u>. at R. 37.)  Rauch elected not to participate in SCI-Frackville's therapeutic community.  (<u>Id</u>. at R. 36.)   Rauch did not wish to participate in a therapeutic community "where inmates run the program and decide your fate" nor did he wish to participate in a drug or alcohol program run by SCI-Frackville's therapeutic community staff.  (<u>Id</u>. at R. 38 and R. 52.)

Rauch also avers that Ms. Hammit attempted to have him "written up by the correctional officers for acts he did not commit."  (Doc. 6, Amended Complaint at ¶ 22.) Rauch's knowledge of these attempts are derived from the verbal statements of other inmates. (Doc. 33-14, Rauch Depo. at RR. 27- 28.)  Rauch never received an institutional misconduct while participating in the RSAT program.  (<u>Id</u>.)  Finally, Rauch avers that on one occasion Ms. Martin "threatened to drop Mr. Rauch 'off a bridge onto his head.'" (<u>Id</u>. at ¶ 26.)

## III.    Summary Judgment Standard.

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 247 - 48, 106 S.Ct., 2505, 2510, 91 L.Ed.2d 202 (1986).

Only disputes over facts that might affect the outcome of the suit will preclude the entry of

summary judgment.  The substantive law determines which facts are material.  Id. at 248, 106

S.Ct. at 2510.  A dispute is genuine if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  Id. at 249, 106 S.Ct. at 2511.

       All doubts as to the existence of a genuine issue of material fact must be resolved

against the moving party, and the entire record must be examined in the light most favorable to

nonmoving party.  P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006).  The

moving party has the burden of showing the absence of a genuine issue of material fact, but the

nonmoving party must present affirmative evidence from which a jury might return a verdict in

the nonmoving party's favor.  Anderson, 477 U.S. at 256-57, 106 S.Ct. at 2514.  Merely

conclusory allegations taken from the pleadings are insufficient to withstand a motion for

summary judgment.  The non-moving party "may not rest upon the mere allegations or denials

of the ... pleading," but "must set forth specific facts showing that there is a genuine issue for

trial."  Saldana v. Kmart Corp., 260 F.3d 228, 231 - 232 (3d Cir. 2001).  Unsubstantiated

arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Township

of Clinton, 984 F.2d 1359, 1370 (3d Cir.1993).  Allegations made without any evidentiary

support may be disregarded.  Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000).

Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  If the evidence in favor of the nonmoving party is merely colorable or not significantly probative, summary judgment should be granted.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356).

## IV.    Discussion.

### A.    Defendants Gateway, Hammit and Martin are State Actors.

In order to state a cognizable claim under 42 U.S.C. § 1983, Rauch must prove that: (1) the defendant(s) deprived him of a federal right, and (2) did so under color of state law. Lugar v. Edmonson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753 - 2754, 73 L.Ed.2d 482 (1982).  In this case, there is no genuine issue of material fact that the defendants are state actors.  Defendants acted under color of law for purposes of § 1983 when undertaking their duties in treating Plaintiff's substance abuse problems.  The Supreme Court in West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), held that a private physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts "under color of state law" within the meaning on § 1983.  Although RSAT applicants volunteered to enter the non-constitutionally mandated rehabilitation program, and

-15-

the program was run by a contract provider (Gateway), the result is no different here than in

West, supra.  In this instance, the Commonwealth outsourced the substance abuse treatment

program it sought to provide to its inmate population to Gateway.  Gateway's services were

offered exclusively within the confines of the prison walls.  As stated in West, "[i]t is the

physician's function with the state system, not the precise terms of his employment, that

determines whether his actions can be fairly attributed to the State."  West, 487 U.S. at 55 - 56,

108 S.Ct. at 2259.  The same is true here.  Gateway, at least within the prison setting, was

performing a rehabilitative service to an incarcerated population, a service that has traditionally

been in the exclusive prerogative of the State.  Gateway and its employees are state actors,

acting under color of law for purposes of § 1983 when undertaking their duties in treating

Plaintiff's substance abuse problems.  See also Stubbs v. DeRose, No. 3:CV-03-2362, 2007

WL 776789 (M.D. Pa. March 12, 2007)(contract chaplain held to be a state actor for § 1983

purposes).

      As for Gateway itself, it is not a "person" subject to suit under § 1983.     Will v.

Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).

Moreover, the Eleventh Amendment to the United States Constitution is consistently interpreted

to preclude suits against a state in federal court by citizens of that state or other states.

Edelman v. Jordan, 415 U.S. 651, 662 - 63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).  The

Commonwealth of Pennsylvania has not waived its rights under the Eleventh Amendment.  42

Pa.C.S.A. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.").  For the foregoing reasons, Gateway is entitled to summary judgment.

However, having found that Ms. Hammit and Ms. Martin are state actors, the Court must next determine whether Rauch was deprived of a right secured by the Constitution and the laws of the United States.

### B.    Entitlement to Due Process Protections.

Rauch claims he was removed from the RSAT program in violation of his Due Process rights.  The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next step is to define what process is mandated to protect it.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000); Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002).

Rauch has no interest protected by the Due Process Clause in either parole, or a rehabilitative treatment programs.  Yet, under certain circumstances, states may create liberty interest that are protected by the Due Process Clause.  Sandin v. Conner, 515 U.S. 472, 484,

115 S.Ct. 2293, 2300, 132 L.Ed.2d. 418 (1995).  "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id.  First, Rauch does not have a constitutional right to a substance abuse program.  "It is well-established that those individuals serving criminal sentences have no constitutional right to rehabilitation while in prison."  McFadden v. Lehman, 968 F. Supp. 1001, 1004 (M.D. Pa. 1997), citing Hoptowit v. Ray, 682 F.2d 1237, 1254-55 (9th Cir. 1982)("There is no constitutional right to rehabilitation."); see also Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279 n.9, 50 L.Ed.2d 236 (1976)(Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss."); Groppi v. Bosco, 208 Fed.Appx. 113, 115 (3d Cir. 2006) (finding that a prisoner "does not have a constitutional right to participate in the drug treatment program.)  Next, even if Rauch had successfully completed the RSAT program, the PBPP is not required to grant him reparole.[9]  Because Plaintiff cannot

---

[9]  The federal constitution does not grant Rauch a liberty interest in parole.  Board of Pardons v. Allen, 482 U.S. 369, 373, 107 S.Ct. 2415, 2418, 96 L.Ed.2d 303 (1987); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979) ("there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence").  While "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause," see Sandin, 515 U.S. at 483 - 484, 115 S.Ct. at 2300, the Pennsylvania Supreme Court has long held that the denial of parole does not implicate a constitutionally protected liberty interest (continued...)

establish that there is a constitutionally-protected interest in participating in a rehabilitative

program or in receiving reparole after participation in the RSAT program, he cannot show that

his removal from the RSAT program for his alleged failures to follow program guidelines violated

his due process protections.  Rauch offers no evidence to support his assertion of a Due

Process interest in reparole immediately upon completion of an RSAT program.  Nor has Rauch

proven that he had a state or otherwise created liberty interest in reparole that was impacted by

his removal from the RSAT program.  Defendants are entitled to summary judgment on Rauch's

Due Process claim.


C.     Retaliatory Discharge from the RSAT Program.

            Rauch also claims that his expulsion from the RSAT program was in retaliation

for the derogatory comments he wrote about Ms. Hammit and others in his private therapy

---

[9](...continued)
because parole is a discretionary matter, granted only to prisoners who demonstrate the ability
to function in society as a law-abiding citizen.  See Coady v. Vaughn, 564 Pa. 604, 770 A.2d
287, 291 (2001); Rogers v. Pa. Bd. of Prob. & Parole, 555 Pa. 285, 724 A.2d 319 (Pa. 1999).
Parole denial can, however, give rise to a substantive due process deprivation if it is based on
constitutionally impermissible reasons.  See Burkett v. Love, 89 F.3d 135, 139-140 (3d Cir.
1996).  In the instant case, however, we need not examine the basis for the PBPP's repeated
denials to reparole Rauch as the PBPP is not a named defendant in this action.  It is undisputed
that the PBPP, and not the named defendants, have the sole discretion to reparole Rauch.
Furthermore, contrary to Rauch's suggestions, none of his reparole denials were based solely
on his 2003 removal from the SCI-Camp Hill RSAT program run by the Defendants. (See Doc.
33-4, Exh. C, June 9, 2003, NOBD; Doc. 33-5, Exh. D, May 25, 2004, NOBD; Doc. 33-6, Exh.
E, April 29, 2005, NOBD; and Doc. 33-7, Exh. F, October 28, 2005, NOBD.)

journal which was read in violation of his First Amendment rights, and because of his mother's telephone contact with Defendants and others regarding her disapproval of the management of the RSAT program as well as the treatment of her son.[10]

In order to sustain an action for retaliation, an inmate plaintiff must prove that: (1) the conduct that led to the alleged retaliation was constitutionally protected; (2) he suffered some "adverse action" at the hands of prison officials that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was a "substantial" or "motivating factor" in the decision to take adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Where the prisoner seeks to establish this causal link based upon the temporal proximity between the protected conduct and the alleged retaliatory act, "the timing of the alleged retaliatory action must be *unusually suggestive* before a causal link will be inferred." Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); Rauser, 241 F.3d at 334. The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. See Lape v. Pennsylvania, 157 Fed. Appx. 491, 498 (3d Cir. 2005).

---

[10] Rauch's mother, not Rauch, was exercising her First Amendment rights when she spoke to the various RSAT and prison employees regarding her son. These conversations, however, do not provide Rauch with a basis to support a claim of retaliation as he was not engaged in any constitutionally protected activity on which to assert a retaliation claim based on his mother's conduct. Alternatively, for the reasons set forth below, Rauch has not demonstrated that the Defendants would not have taken the same action of removing him from the program, absent his mother's calls, for legitimate penological interests.

Once the prisoner has established a prima facie case of retaliation, the burden shifts to the defendant to prove by a preponderance of the evidence that they would have taken the same actions, absent the protected conduct, for reasons reasonably related to a legitimate penological interest.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (quoting Rauser, 241 F.3d at 334).  Prison officials may still prevail, however, by proving that they would have made the same decision absent the protected conduct for reasons reasonable related to a legitimate penological interest.  Rauser, 241 F.3d at 334.  When analyzing a retaliation claim pursuant to the above, it must be recognized that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned.  Id.  Because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must come forward with more than "general attacks" on defendants' motivations and must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury...." Crawford-El v. Britton, 523 U.S. 574, 598, 600, 118 S.Ct. 1584, 1596-1597, 1598, 140 L.Ed.2d 759 (1998).

Rauch fails to present a prima facie case for retaliation.  Rauch claims Defendants retaliated against him for writing derogatory comments about them in his therapy journal.  In the Fourth Amendment context, the law affords considerably less recognition to an inmate's subjective expectation of privacy.  Hudson v. Palmer, 468 U.S. 517, 530, 104. S.Ct.

3194, 3202, 82 L.Ed.2d 484 (1984); Willis v. Artuz, 301 F.3d 65, 68 (2d Cir. 2002).  No Fourth

Amendment claim exists relative to Ms. Hammit's reading or sharing of portions of Rauch's

journal with other therapeutic staff.  First, Rauch was a voluntary participant in the RSAT

program.  Gateway's policy specifically notes that his journal would be read by his counselor.

Next, it was Rauch who brought his journal to Ms. Hammit and gave her permission to read it

and keep it.  (Rauch Depo. at R. 19 and R. 26.)  Furthermore, although neither party has

submitted any portion of Rauch's journal, it is undisputed that Rauch wrote several vulgar and

derogatory personal attacks about the all female RSAT staff. (Id. at R. 22 and R. 41.)

Expressing a derogatory and inappropriate remark towards a prison staff member is not

protected speech, nor is arguing with them as to the manner in which they conduct the RSAT

program.  See Wilson v. Schillinger, 761 F.2d 921, 925 (3d Cir. 1985)(prisoners' First

Amendment rights may be curtailed because of institutional needs).  Rauch's  remarks

regarding the all female RSAT were inappropriate, disrespectful and demonstrative of his

reluctance to accept their guidance, therapy or the RSAT program guidelines and goals.[11]

Rauch has failed to show that the conduct which he claims led to the retaliatory discharge from

the program was constitutionally protected.  See Rauser, 241 F.3d at 333 (relief unavailable

where conduct not protected by First Amendment).  Thus, his retaliation claim must fail.

---

[11]  Rauch states that after he was not promoted to level three when he expected to be
that "[he] quit really even following the program ... I really didn't pay attention to their board."
(Rauch Depo at R. 17.)

Assuming arguendo that Rauch could prove that his self-expression of personal attacks against the RSAT staff contained in his therapeutic journal was a constitutionally protected activity, there is sufficient evidence within the record to prove that Defendants would have made the same decision to remove him from the RSAT program, absent the alleged protected conduct, for reasons reasonably related to legitimate penological interests.  The RSAT counselors are responsible for only promoting those inmates whom they feel have benefitted and advanced in the substance abuse rehabilitation program.  It is contrary to logic to suggest that a participant's unsatisfactory performance in the RSAT program, even for the entire six months, i.e. their simple attendance in the program, should equate to a guaranteed promotion from Phase I of the RSAT program.  But yet, that is what Rauch argues.  The undisputed record shows that Ms. Hammit, even prior to reading Rauch's journal, did not believe Rauch was putting his best efforts into the program.  Rauch admits that he received "a couple" of demerits while in the program.  It is significant that after Ms. Hammit reviewed his journal, Rauch was not  immediately removed from the RSAT program.  (Doc. 33-14, Rauch Depo. at R. 20.)  In fact, Defendants gave Rauch additional time to satisfactorily complete the program's requirements in order to allow him to improve his performance and move on to the next level, a halfway house, if approved by the PBPP.  (SMF at ¶ 18; Doc. 33-3, March 6, 2003 Letter from Superintendent Kelchner; Doc. 33-14, Rauch Depo at RR. 26 - 27.)  Defendants also gave Rauch a RSAT release date and enrolled him in the CORE program.  (Doc. 33-14,

Rauch Depo. at R. 27; Doc. 36-2, at R. 29, Exh. D, Certificate of Completion dated February 14, 2003).  All of these things took place after Ms. Hammit had read his journal.  Unfortunately, even after Rauch was given an extension of time to allow for his program performance to improve, Plaintiff failed to turn in two mandatory assignments and staff unanimously decided to remove Rauch from the program.

Plaintiff has not come forth with any competent evidence from which it can be inferred that the Defendants did not act for legitimate reasons.  Rauch has not shown that he was penalized for the exercise of a constitutionally protected right.  Rauch's conclusory allegations are insufficient to show that the legitimate reasons proffered by Defendants were pretextual in nature.  The undisputed record is abundantly clear that notwithstanding the derogatory comments in the journal, or his mother's telephone calls, Defendants would have made the same decision to discharge Rauch from the program due to his lack of satisfactory performance.  Defendants are entitled to summary judgment on Rauch's retaliation claims.


D.    **Rauch's Fourteenth Amendment Equal Protection Claim**.

Rauch asserts that his Fourteenth Amendment right to equal protection was violated by Defendants when he was treated more harshly than other RSAT participants.  The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a

direction that all persons similarly situated should be treated alike.  City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)); Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir.1996).  In the absence of a fundamental right or a protected class, equal protection only requires that a regulation which results in the unequal treatment of an inmate bears some rational relationship to a legitimate penological interest.  See McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); Hodges v. Klein, 562 F.2d 276 (3d Cir. 1977).   It is incumbent upon one asserting an equal protection claim to prove the existence of some purposeful discrimination. McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987).  Plaintiff must also demonstrate that he received different treatment from that received by other individuals similarly situated.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).  Plaintiff is obligated to prove his allegations by either direct or circumstantial evidence.  Pa. v. Flaherty, 983 F.2d 1267 (3d Cir.1993) (Intent is a prima facie element of a § 1983 equal protection claim of discrimination) (citing Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976.  See also Williams v. Pa. State Police, 108 F.Supp.2d 460, 471 (E.D.Pa.2000) ("to prevail on a § 1983 claim, a plaintiff must prove that the Defendant intended to discriminate") (citation omitted).

The record before the Court reveals that Defendants did not purposely discriminate against Rauch on the basis of his race, gender or nationality.  A prison inmate cannot make out a violation of his equal protection rights simply by stating that other inmates were treated differently.  In this case, Rauch provides no evidence, other than his own assertions, that he was treated differently than any other similarly situated RSAT participant.  Rauch's deposition testimony is counter productive to his claim of disparate treatment.  Rauch states that Defendants "had it out" for other inmates and that others were removed from the RSAT program.  (Doc. 33-14, Rauch Depo at R. 31.)  Similarly, Plaintiff does not provide any evidence to suggest that he was the sole RSAT participant whose stay was ever extended beyond the traditional six month period.  Plaintiff's equal protection claim is comprised of conclusory allegations and speculation that other RSAT participants received more favorable treatment than him by the Defendants.  Even if Plaintiff was treated differently, it is evident from his allegations that said treatment, the reading of his journal and his discharge from the program for failing to comply with its mandatory requirements, had a rational relationship to a legitimate penological interest of not promoting a RSAT applicant who has not shown satisfactory receptivity to the program, or an inability to comply with its requirements and goals.  We do not find that Plaintiff has properly stated that he and any other inmates were similarly situated for the purposes of asserting or proving an equal protection claim.  The equal protection claim has no arguable basis in law or in fact and therefore Defendants' motion for summary judgment on this claim will be granted.

E.     Verbal Threats Made By Carol Martin.

Rauch alleges Ms. Martin threatened to drop him "off a bridge onto his head."

(Doc. 6, Amended Complaint at ¶ 26.)  Mere words spoken to a prisoner by a correctional

officer, or other state actor, even when those words are harsh, do not amount to a violation of

the prisoner's civil rights by the officer.   Johnson v. Glick, 481 F.2d 1028, 1033 n. 7 (2d

Cir.1973); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir.1979)(verbal harassment by

threatening to hang an inmate is not sufficient to state a constitutional deprivation under §

1983).  "Standing alone, simple verbal harassment does not constitute cruel and unusual

punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection

of the laws." Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir.2000). Accordingly, summary

judgment on Rauch's claim against the defendants based on threats and verbal abuse will be

granted.


F.     Pendent Jurisdiction.

As summary judgment has been granted on all Plaintiff's federal claims, pursuant

to 28 U.S.C. § 1367(c)(3)[12] the Court declines to exercise supplemental jurisdiction over any

_____

[12]Title 28 U.S.C. § 1367(c)(3) provides that "[t]he district courts may decline to exercise
supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has
dismissed all claims over which it has original jurisdiction."   See also 28 U.S.C. § 1367(d).

state law claims raised by Plaintiff.  The Third Circuit Court of Appeals has held that "'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000).  There is no affirmative justification for exercising supplemental jurisdiction in this case.  Accordingly, Rauch's state law claims will be dismissed, without prejudice.

V.      Conclusion.

        For the reasons set forth above, Defendants' motion for summary judgment will be granted.  Rauch has not shown the existence of a genuine issue of fact material on his claims.  Defendants have shown they are  entitled to judgment in their favor based on the undisputed facts of record.  An appropriate order will be issued.

Dated: November 16, 2007                    /s/ A. RICHARD CAPUTO
                                            A. RICHARD CAPUTO
                                            United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JESS L. RAUCH,                          :
                                        :
        Plaintiff,                      :
                                        :        CIVIL NO. 3:CV-04-2216
    vs.                                 :
                                        :        (JUDGE CAPUTO)
DEPARTMENT OF CORRECTIONS               :
OF THE COMMONWEALTH OF                  :
PENNSYLVANIA, ET AL.,                   :
                                        :
        Defendants.                     :

O R D E R

NOW, this **16th day of NOVEMBER, 2007**, for the reasons set forth in the

foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1.    Defendants' Motion for Summary Judgment (Doc.
      32) is **GRANTED**.

2.    The Clerk of Court is directed to enter judgment in
      favor of all Defendants and to mark this matter
      **CLOSED**.

/s/ A. RICHARD CAPUTO
A. RICHARD CAPUTO
United States District Judge